**TOWN OF JACKSON, Appellant (Defendant below),**

**Chuck Argento and John Dorsey (Defendants below),**

v.

**Peter B. SHAW, Appellee (Plaintiff below).**

**Chuck ARGENTO and John Dorsey, Appellants (Defendants below),**

**Town of Jackson, (Defendant below),**

v.

**Peter B. SHAW, Appellee (Plaintiff below).**

**Nos. 4747 and 4748.**

Supreme Court of Wyoming.

Sept. 27, 1977.

David K. Larson, Jackson, signed the brief for appellant and defendant, Town of Jackson, and waived oral argument.

Paul O. Vaughn, Jackson, signed the brief for appellants and defendants, Chuck Argento and John Dorsey, and waived oral argument.

Robert B. Ranck, Ranck & Bommer, Jackson, signed the brief for appellee, Peter B. Shaw, and waived oral argument.

Before GUTHRIE, C. J., and RAPER, THOMAS and ROSE, JJ., and J. F. MAHONEY, District Judge.

RAPER, Justice.

Appellants-defendants appeal a jury verdict and judgment entered by the district court for Teton County, Wyoming, awarding appellee-plaintiff $5,000.00 compensatory and $10,000.00 punitive damages against them, jointly, based on an action in false

arrest. In this review, the questions raised concern:

1. Probable cause for arrest;

2. Damages awarded, particularly those that are punitive;

3. Liability of the Town of Jackson, its sovereign immunity and related issues.

We shall affirm in part, hold punitive damages excessive, allow remittitur, or if not accepted, remand for new trial on the latter issue alone.

The arrest in controversy occurred in the late evening of July 25, 1975, at Jackson, Wyoming. At approximately 10:45 p. m., plaintiff, along with his wife and a few friends, entered a bar in downtown Jackson. After staying about 45 minutes, plaintiff and his wife decided to leave. As they left, plaintiff was carrying some beer in a paper cup. Just outside the door, located below ground-level, the plaintiff encountered Jackson municipal police officer, Chuck Argento, a defendant-appellant herein, who touched plaintiff's arm and reminded him of the Jackson open-container ordinance. Plaintiff replied that he did not believe in the ordinance, describing it as "bullshit" or "son-of-a-bitching" or "dumb," but, nevertheless, peacefully, and without further resistance, placed the cup on the ground, as Argento held his arm and again repeated the ordinance, to which another officer present responded, "Don't hassle him [plaintiff]." Shaw's wife commented that he should probably not leave the cup there because they would probably arrest him for littering. Argento then also advised plaintiff he could not leave the cup on the ground as there was an anti-littering ordinance, for transgression of which he could be arrested. When plaintiff reached to pick up the cup, one of the bar employees had already removed it. The Shaws then went up the outside steps and left.

A few moments later, Jackson municipal police officer, John Dorsey, a defendant-appellant, saw what he believed to be spit come over the stairway railing above his head and brush Argento on the arm. Both officers immediately ran up the stairs toward the point where they thought the substance, "whatever it was," had come from. Neither of them took any time to consider the nature of the substance nor did either of them see anyone spit. As they reached the first stairway landing, Dorsey spotted the Shaws some distance away, just entering an alley. Both officers ran after them.

Officer Dorsey reached the Shaws first, followed immediately by officer Argento, who then arrested plaintiff for "breach of the peace," for the "profane language" he had directed at the open-container ordinance a few minutes before and for the rude behavior of the alleged spitting, an allegation defendant promptly denied.[1] Neither prior to the arrest nor after it, before he was taken to the courthouse, was any further inquiry made as to defendant's identity or his participation in the alleged spitting incident, although both he and his wife repeatedly asked why he was being arrested.

Upon arrival at the police station, while being booked in, defendant was finally identified as a local resident and an acquaintance of Argento, though not immediately placed by the latter, who advised plaintiff here that since he was a local resident, he would be released on his signature if he would sign the citation, agreeing to appear in municipal court. The plaintiff complied, was released and appeared at the time stated in the citation. The charges were dismissed by the municipal court judge because of a mistake in the appearance date, it being a day on which he did not sit. The charges were never further pursued.

---

1. The ordinance allegedly violated is as follows: "Whoever by any loud or unnecessary talking, hallooing, or by any threatening, abusive, profane, or obscene language, or violent actions, or by any other rude behavior, or by disturbing the public tranquility and order by any loud and unnecessary noise interrupts or disturbs the peace of any inhabitant of the town, or interferes with such inhabitant, pursuing a lawful and appropriate occupation by any of the foregoing actions, is guilty of breach of the peace and shall upon conviction be punished as provided in § 1.12.010 of this code."

At the close of the plaintiff's evidence, the defendants also rested. All parties moved for a directed verdict on the issue of probable cause for arrest. In granting plaintiff's motion, the trial judge ruled there was no material dispute in evidence with regard to probable cause, it being mere speculation that plaintiff had done the spitting, if, in fact, the substance was spit, which was never confirmed. On appeal, appellants assert that the existence of good faith and probable cause was a determination which should have been made by the jury, not the trial judge.

 In reviewing the grant of a directed verdict by a trial court, consideration must be given to all evidence favorable to party against whom the motion is directed, as well as to all reasonable and legitimate inferences which might be drawn therefrom.[2] *McCarthy v. Croker*, Wyo. 1976, 549 P.2d 323; *Barnes v. Fernandez*, Wyo. 1974, 526 P.2d 983; *Brennan v. Laramie Newspapers, Inc.*, Wyo. 1972, 493 P.2d 1044. Whether or not the evidence so viewed is sufficient to create an issue for the jury is solely a question of law to be answered by the trial court. That court must determine whether or not the evidence is such that, without weighing the credibility of the witnesses, or otherwise, considering the weight of the evidence, there is but one conclusion as to verdict which men of reason could reach. *Barnes v. Fernandez, supra.* Within those guidelines we believe there is no question that the standard of police conduct for warrantless arrest, as set out in *Rodarte v. City of Riverton*, Wyo. 1976, 552 P.2d 1245, and § 7–12.3, W.S.1957, 1975 Cum. Supp., was not here met; and, as such, the trial court's direction of a verdict of no probable cause was not error.

 In *Rodarte*, it was held that the standard governing police conduct in a civil suit for wrongful arrest was composed of subjective as well as objective elements:

"If the defendant, acting as a reasonable police officer at the time of making the arrest, in good faith believes that such facts are present as to lead him to an honest conclusion that a crime is being [or has been] committed by the person to be arrested, then he may not be held liable for false arrest—even if the crime was not in fact being committed—and even if probable cause *in the constitutional sense* is not present.

"But—if the objective inquiry reveals that even though the officer purports to have been in good faith—yet he did not make the inquiry—the determinations— the observations and the investigation of fact required by an officer of the law acting reasonably and prudently in the same circumstances, then he may not be relieved of his liability for wrongful and false arrest." 552 P.2d at 1259. (Bracketed material supplied.)

Thus, in the situation at bar, the defendant officers were required to allege and prove not only that they believed in good faith that their conduct in the arrest of plaintiff was lawful, but also that such a good-faith belief on their part was reasonable. Such proof they totally failed to make. The purported bases for plaintiff's arrest on charges of breach of peace were his profane language, directed toward the open-container law, and the rude behavior of the alleged spitting. Yet both officers testified at trial that after their discussion with plaintiff, concerning the open-container and littering ordinances, they felt everything was fine. Such a resolution on their part would seem to negate any argument that the prior discussion and incident could reasonably be considered justifiable cause for a warrantless misdemeanor arrest. Section 7–12.3, W.S.1957, 1975 Cum.Supp.[3] Such a conclu-

---

**2.** The fact conclusions are based entirely on the testimony of the defendant police officers, called by plaintiff as adverse witnesses; other evidence shows no material conflict.

**3.** Section 7–12.3 provides in pertinent part:

"(a) A peace officer may arrest a person without a warrant and detain him until a legal warrant can be obtained when:

"(i) Any criminal offense is being committed in his presence by the person to be arrested; or

\* \* \* \* \* \*

sion leaves only the alleged spitting as a possible valid basis for plaintiff's arrest. Even there, the probable-cause connection to plaintiff is so weak as to be nonexistent. Neither officer nor anyone else saw anyone spit and neither could say that the substance involved was spit, since neither before nor after arrest was any inquiry made as to the nature of the substance involved. It was suggested that it might have been beer foam, if anything; no mark was left on Argento's clothing. Both officers only "believed" that the substance involved was spit, and, under the circumstances, such a belief was not reasonable. Further, the only possible conceivable connection between plaintiff and the spitting incident was the prior discussion concerning the open-container ordinance and the fact that he and his wife were seen leaving the area shortly thereafter. Neither ground is sufficient to fulfill the "reasonable belief" requirements of the misdemeanor arrest statute, § 7–12.3, nor the standard of probable cause set out by *Rodarte*. Probable cause must amount to something more than suspicion. *Rodarte*, supra. Under these circumstances, it is clear the standard of reasonableness and prudence required of police officers in making warrantless arrests was not met, and such conclusion is the sole one that men of reason could draw from the circumstances of the case. The trial court's direction of verdict finding no probable cause was not error.[4]

■ Defendant's second point of error alleges that the damages awarded by the jury, $5,000.00 compensatory and $10,000.00 punitive, are not supported by the evidence presented at trial or, in the alternative, are so excessive as to be the result of prejudice, bias, or passion on the part of the jury. When considering such assertions, only evidence advantageous to the prevailing party is considered, along with each favorable inference reasonably and fairly drawn from it in support of the jury's verdict. *Rissler & McMurry Company v. Atlantic Richfield Company*, Wyo. 1977, 559 P.2d 25.

■ Speaking now only of the compensatory award, the amount of money which will compensate one for an unwarranted restraint of his person cannot realistically be the subject of exact computation. The question involves such emotions as humiliation, shame and public disgrace, which are not capable of calculable qualification. Annotation, Damages-Amount-False Imprisonment, 35 A.L.R.2d 273. Where law thus provides no specific measure for quantifying damages, the amount to be awarded rests almost totally within the discretion of the jury, and courts, both trial and appellate, are reluctant to interfere with that decision unless by its excessiveness or inadequacy the award carries with it an implication of passion, prejudice or bias or the result of some erroneous basis. 22 Am. Jur.2d (Damages) § 366, pp. 472–474; 35 C.J.S. False Imprisonment § 68, pp. 780–783. This is the standard for use generally

---

"(iii) A misdemeanor, as defined by section 6–2 of the statutes has in fact been committed and the peace officer has reasonable grounds for believing that the person to be arrested has committed it and has reasonable grounds for believing that the person

"(A) Will not be apprehended unless immediately arrested; or

"(B) May cause injury to himself or others or damage to property unless immediately arrested; or

"(C) May destroy or conceal evidence of the commission of such misdemeanor."

Section 6–2, W.S.1957, provides that offenses punishable by death and penitentiary imprisonment are felonies and all others are misdemeanors.

4. Even though the usual rules pertaining to the directing of a verdict may be used, as we have

here, the question of want of probable cause is peculiarly one of law for the court, when there is no dispute as to the facts. *Nesmith v. Alford*, 5 Cir. 1963, 318 F.2d 110, 122, reh. den. 319 F.2d 859, cert. den. 375 U.S. 975, 84 S.Ct. 489, 11 L.Ed.2d 420, and cases there cited. See also § 673, Restatement of the Law of Torts Second, pp. 448–451, both black type and discussion, dealing with malicious prosecution, a tort akin to false arrest or imprisonment. Prosser in Law of Torts, 4th Ed., § 119, pp. 834–850, also discusses who should decide the question of probable cause, court or jury, § 119, beginning at p. 846. We need not decide in this case by whom that decision should be made, when more than one conclusion may be drawn from the facts or the facts are in dispute.

in Wyoming, *Booth v. Hackney*, Wyo. 1973, 516 P.2d 180; *Holly Sugar Corporation v. Perez*, Wyo. 1973, 508 P.2d 595, and is the standard which we must here use. We cannot set aside an award of damages merely because we might consider it excessive; there must be more basis than that. *State Highway Commission v. Peters*, Wyo. 1966, 416 P.2d 390.

■ Of the various formulas used by different courts to determine the question of excessiveness, the frequently quoted and paraphrased standard employed by Chancellor Kent in a libel case answers the problem rather satisfactorily:

> " * * * The damages, therefore, must be so excessive as to strike mankind, at the first blush, as being beyond all measure unreasonable and outrageous, and such as manifestly show the jury to have been actuated by passion, partiality, prejudice, or corruption. In short, the damages must be flagrantly outrageous and extravagant, or the court cannot undertake to draw the line; for they have no standard by which to ascertain the excess. * * *" *Coleman v. Southwick*,

1812, 9 Johnson 45, 6 Am.Dec. 253, 258. Under such a standard here, we feel defendants have failed to make any appropriate showing as to compensatory damages. They have failed to indicate any specific error or evidence which would justify a holding of excessiveness of compensatory damages and our independent review of the record reveals none to exist. Defendants elected to lump their evidence with the plaintiffs and put on no separate defense.

However, when it comes to the consideration of punitive damages, it would shock our collective conscience to approve them in the amount awarded. We do not question that it is proper to allow punitive damages in a false imprisonment, sometimes called a false arrest civil case, and we cannot entirely set aside the jury's conclusion that some should be allowed here. 32 Am.Jur.2d (False Imprisonment) § 116, p. 163; 35 C.J.S. False Imprisonment § 67, pp. 776–780. However, punitive damages are of an extraordinary nature, with special consider-

ations not entirely related or devoted to compensating the plaintiff for a wrong done.

■ Punitive damages are not a favorite of the law, are to be allowed only with caution within narrow limits and have been the subject of much controversy. *Alaska Placer Company v. Lee*, Alaska 1976, 553 P.2d 54; *White v. Doney*, 1969, 82 Idaho 217, 351 P.2d 380; *Perez v. Central National Insurance Company of Omaha*, 1958, 215 Or. 107, 332 P.2d 1066; *Southwestern Greyhound Lines v. Rogers*, Okl.1954, 267 P.2d 572; Prosser, Law of Torts, 4th Ed. 1971, § 2, p. 11. The Supreme Court of Washington flatly states that the doctrine of punitive damages is unsound in principle and that they cannot be recovered in that jurisdiction, absent statutory authorization. *Maki v. Aluminum Building Products*, 1968, 73 Wash.2d 23, 436 P.2d 186.

This court has traditionally accepted the doctrine of punitive damages but always with some reservation of the right to examine them closely and to reduce them by accepted methods, if necessary. Our most recent declaration in that regard was in *Petsch v. Florom*, Wyo.1975, 538 P.2d 1011, 1014:

> "We realize that there may be occasions when a court should set aside a verdict and judgment for punitive damages. While the amount to be awarded rests largely in the discretion of the jury, and taking into consideration the circumstances of each case, the 'discretion of the jury is not, however, an arbitrary or unlimited one. The jury is not at liberty to award by way of punitive damages any amount, regardless of how large it may be.' * * * "

In *Hall Oil Company v. Barquin*, 1925, 33 Wyo. 92, 237 P. 255, this court, through remittitur, reduced punitive damages. This court has thus kept itself in a position of flexibility to deal with punitive damages on a case-to-case basis, as it should.

■ It is well settled by this court and elsewhere that punishment of the wrongdoer and protection of society and the social

order lie behind the doctrine of exemplary damages. *Waters v. Brand*, Wyo.1972, 497 P.2d 875; *Condict v. Hewitt*, Wyo.1962, 369 P.2d 278; *Hall Oil Company v. Barquin, supra.* The basic purpose of entering a judgment for punitive damages against a defendant in a civil action is to punish and penalize him for a certain wrongful and aggravated conduct and to serve as a warning to others to deter. *Beebe v. Pierce*, 1974, 185 Colo. 34, 521 P.2d 1263; *Glenn v. Esco Corporation*, 1974, 268 Or. 278, 520 P.2d 443; *Abbie Uriguen Oldsmobile Buick, Inc. v. United States Fire Insurance Company*, 1973, 95 Idaho 501, 511 P.2d 783. For many more cases, see ■■■ Damages, West's Digest System.

■■■ The doctrine goes even significantly further to an overwhelming extent. Punitive damages are not recoverable to in any way compensate the plaintiff but are assessable solely for the purpose of punishment and deterrence. *Crawford v. Pittsburgh–Des Moines Steel Co.*, U.S.D.C., Wyo. 1974, 386 F.Supp. 290; *Ackerley v. Credit Bureau of Sheridan*, U.S.D.C., Wyo.1974, 385 F.Supp. 658; *Alaska Placer Company v. Lee, supra*; *K–Mart No. 4195 v. Judge*, Tex.Civ.App.1974, 515 S.W.2d 148; *Acheson v. Shafter*, 1971, 107 Ariz. 576, 490 P.2d 832; *Templeton Feed and Grain v. Ralston Purina Company*, 1968, 69 Cal.2d 461, 72 Cal. Rptr. 344, 446 P.2d 152, 157; *Barnes v. Lehman*, 1948, 118 Colo. 161, 193 P.2d 273; *Guardianship of Estate of Smith*, 1973, 211 Kan. 397, 507 P.2d 189, 194; *Miller v. Schnitzer*, 1962, 78 Nev. 301, 371 P.2d 824; *Cays v. McDaniel*, 1955, 204 Or. 449, 283 P.2d 658.

■■■ Since compensation to the plaintiff is not a factor with punishment and deterrence, the primary goal of punitive damages, we must view the case with those principles in mind. "Accordingly, our consideration is whether the award for punitive damages in this case can be said to serve a useful purpose as a punishment to a defendant for the protection of the public." *Condict v. Hewitt, supra.*

■■■ There is no doubt but what such a massive award would punish the two police officer defendants but we ought to temper purpose with reason. The punitive allowance should be in an amount that would promote the public interest without financially annihilating the defendants. Wrongdoers may be punished without being destroyed. *Caple v. Raynel Campers, Inc.*, 1974, 90 Nev. 341, 526 P.2d 334; *Miller v. Schnitzer, supra*; *Levine v. Mills*, Mun. App.D.C.1955, 114 A.2d 546, reversed as to compensatory damages but affirmed as to punitive damages, 98 U.S.App.D.C. 137, 233 F.2d 16, cert. den. 352 U.S. 858, 77 S.Ct. 86, 1 L.Ed.2d 67. Two defendant police officers have made a mistake and the plaintiff has been granted generous compensation for their wrong to him. While it is our desire to protect the public from abuse, we must at the same time not be a party to causing an abuse to two other citizens. The verdict for punitive damages is unnecessarily harsh to accomplish the purpose of punitive damages.

In *Hall Oil Company v. Barquin, supra*, this court voiced that concern and quoted with favor as follows:

"[I]t is an ancient and accepted doctrine of the common law that judges have the power and are clearly charged with the duty of setting aside verdicts, where the damages are either so excessive or so small as to shock the conscience and to create the impression that the jury has been influenced by passion or prejudice, or has in some way misconceived or misinterpreted the facts or the law which should guide them to a just conclusion. The theory upon which punitive or exemplary damages are generally held in this country to be allowable, is that of punishment of the offender and a warning to others. * * * "

Our research confirms that same view and we find courts frequently setting aside and reducing jury verdicts for punitive damages, as this court did in *Hall Oil Company v. Barquin, supra*. *Kesler v. Rogers*, Utah 1975, 542 P.2d 354; *Ford v. Guarantee Abstract and Title Co., Inc.*, 1976, 220 Kan. 244, 553 P.2d 254; *Basden v. Mills*, Okl.1970, 472 P.2d 889; *K–Mart No. 4195 v. Judge*,

*supra*; *Washington County Kennel Club, Inc. v. Edge*, Fla.App.1968, 216 So.2d 512; *Rooks v. Brunch*, 1969, 202 Kan. 441, 449 P.2d 580; *Sanchez v. Dale Bellamah Homes of New Mexico, Inc.*, 1966, 76 N.M. 526, 417 P.2d 25; *Winter v. Campbell*, 1964, 148 W.Va. 710, 137 S.E.2d 188; *White v. Doney, supra*; *Donovan v. Guy*, 1955, 344 Mich. 187, 73 N.W.2d 471; *Levine v. Mills, supra*; *Lomonaco v. Village of Canastota*, 1954, 284 App.Div. 926, 134 N.Y.S.2d 282; *Barnes v. Lehman, supra*.

There is a particular technique by which a court approaches the problem of an excessive verdict; it is by the device of remittitur, followed by this court in *Hall Oil Company v. Barquin, supra*. We cannot deprive the plaintiff his constitutional right to a jury determination of the punitive damages he claims.[5] The practice of remittitur is sanctioned by long usage. 11 Federal Practice and Procedure, Wright and Miller, § 2815, pp. 99–106. By this means, the plaintiff is offered an opportunity to accept an amount specified by this court, less than the jury verdict. The plaintiff, if he accepts, files with the clerk of the district court a remittitur of the amount by which the verdict should be reduced within the judgment of this court. Otherwise, the judgment will be reversed in whole or in part and the case remanded for a new trial in accordance with this court's mandate.

Rule 59(a), W.R.C.P., confirms the longstanding principle that it is the duty of a judge, when not satisfied with a jury verdict, to set it aside and grant a new trial for one of the reasons allowed. 11 Federal Practice and Procedure, Wright and Miller, § 2801, pp. 26–29. The reason for that capability is dramatically expressed in an excerpt from *Aetna Casualty & Surety Company v. Yeatts*, 4 Cir. 1941, 122 F.2d 350, 353:

"* * * The exercise of this power is not in derogation of the right of trial by jury but is one of the historic safeguards of that right. *Smith v. Times Pub. Co.*, 178 Pa. 481, 36 A. 296, 35 L.R.A. 819; *Bright v. Eynon*, 1 Burr, 390; *Mellin v. Taylor* 3 B.N.C. 109, 132 Eng. Reports 351. The matter was well put by Mr. Justice Mitchell, speaking for the Supreme Court of Pennsylvania in *Smith v. Times Publishing Co.*, supra [178 Pa. 481, 36 A. 298], as follows: 'The authority of the common pleas in the control and revision of excessive verdicts through the means of new trials was firmly settled in England before the foundation of this colony, and has always existed here without challenge under any of our constitutions. It is a power to examine the whole case on the law and the evidence, with a view to securing a result, not merely legal, but also not manifestly against justice,—a power exercised in pursuance of a sound judicial discretion, *without which the jury system would be a capricious and intolerable tyranny*, which no people could long endure. This court has had occasion more than once recently to say that it was *a power the courts ought to exercise unflinchingly.*' (Italics supplied)."[6]

---

**5.** A good, quick summary of the reasons for this principle appears in *Brewer v. Uniroyal, Inc.*, 6 Cir. 1974, 498 F.2d 973, 976:

"* * * [T]he District Court must offer the party awarded damages the choice of a new trial or the amount of the Court's remittitur. *Dimick v. Schiedt*, 293 U.S. 474, 476, 55 S.Ct. 296, 79 L.Ed. 603 (1935); *Kennon v. Gilmer*, 131 U.S. 22, 29, 9 S.Ct. 696, 33 L.Ed. 110 (1889); *Manning v. Altec, Inc.*, 488 F.2d 127, 130 (6th Cir. 1973). The District Court cannot, without the consent of the parties, substitute its judgment for that of the jury on the issue of just compensation. *United States v. 93.970 Acres of Land*, 258 F.2d 17, 31 (7th Cir. 1958), rev'd on other grounds, 360 U.S. 328, 79 S.Ct. 1193, 3 L.Ed.2d 1275

(1959). To permit the Court to do so would erode the parties' Seventh Amendment guarantee of a jury trial."

For a more complete history, see 11 Fed. Practice and Procedure, Wright and Miller, § 2815, cited.

**6.** *Hall Oil Company v. Barquin*, supra, at 237 P. 277, quotes favorably from an equally impressive statement by a Texas court:

"' * * * A power such as may be exercised by juries in awarding exemplary damages is liable to great abuse, may often lead to great oppression, and there is no class of cases in which the conservation of the judge should more frequently find field for action. In cases based on facts which merit condem-

Rule 59(a)(4), W.R.C.P.[7] carries forward the historical privilege of dealing with excessive verdicts in the interest of justice:

"(a) A new trial may be granted to all or any of the parties, and on all or part of the issues. On a motion for a new trial in an action tried without a jury, the court may open the judgment, if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment. Subject to the provisions of Rule 61, a new trial may be granted for any of the following causes:

\* \* \* \* \* \*

"(4) Excessive damages appearing to have been given under the influence of passion or prejudice;

\* \* \* \* \* \*"

Because of their shocking amount, the punitive damages allowed by the jury have the appearance of being given under the influence of passion or prejudice. *Hall Oil Company v. Barquin*, supra. Not only the trial judge but this court has the responsibility of overseeing the work of a jury.

Having determined that we are shocked by the amount of the punitive damage verdict but also deciding that the case is one appropriate for punitive damages, we must now determine an amount by which the verdict is excessive. There is no mathematical formula by which that can be done. As noted in *Petsch v. Florom*, supra, there is no expert who can tell us any more than the jury what punitive damages should be. Much is left to discretion as to what is reasonable. Another rather loose standard we noticed in *Petsch* is that they must bear some reasonable relationship to actual damages. In *Hall Oil Company v. Barquin*,

supra, this court explained that terminology to mean that the character of the injury should be considered in measuring the punishment to be meted out to the defendants.

In preparing for a disposition of this case, we noticed that some courts merely state they are shocked and announce the amount by which the verdict should be remitted. It is doubtful that any explanation will satisfy either of the parties, so, perhaps, that is the better course. However, it seems to us some explanation is due.

 The economic status of the defendants is a consideration, as we have indicated, in not wanting to financially ruin the defendants and such evidence is admissible. *Hall Oil Company v. Barquin*, supra. The theory is that it is not punishment if the defendants cannot feel the impact of a money judgment. A good example is *Acheson v. Shafter*, supra. There, the plaintiff's actual damages were $3,888.00 and punitive damages $15,000.00. However, the proof was that the defendant's net worth was in excess of $300,000.00 and he received the income from the total corpus of two trusts amounting to about $1,000,000.00. The court determined that the means of the defendant justified the punishment.

In the case before us, we have received no help in that regard from the evidence of the plaintiff. For all we know, the defendants may be working as policemen as a hobby and independently wealthy or, on the other hand, of extremely modest means or hopelessly in debt. With that in mind, amongst other considerations, we must practice some temperance.

We by no means minimize the discomfiture which the plaintiff suffered but for that he will be paid in full. The humiliation of his arrest, however, lasted for a

---

nation or even punishment, though not by law constituting crime, juries, under commendable impulses, but with judgment warped by passion, no doubt often render excessive verdicts, and if it be conceded that such verdicts are to stand because the matter was within the discretion of the jury, then we have an absolutism, a despotism, nowhere else found in our form of government \* \* \* the power to grant new trials where verdicts

are evidently excessive, as on other legal grounds, is one given firmly and fearlessly to be exercised, and it cannot be surrendered.' "

7. Rule 59(a) is basically the federal rule but was modified by substituting the substance of § 3–3401, W.C.S.1945, which had been a part of the Wyoming Code of Civil Procedure since before statehood.

period of only 20 minutes. The plaintiff was not physically abused in the sense that he was beaten. We sense some penitence on the part of the officers by the time they arrived at the police station; apparently it began to dawn on them that they acted with poor judgment and in haste. The plaintiff was not there abused in any fashion, his wife was with him, he was not fingerprinted or mugged, was never jailed but released on his own recognizance and then offered a ride home. He had no financial loss other than $9.00 for the time he took for the aborted court appearance on the charge. There is no evidence that his reputation in the community has been in any way affected nor did he lose his job. There is no indication that the plaintiff has suffered any illness as a result and does not appear to have lost anything of intrinsic value.

We view the verdict for punitive damages as unconscionable under all the circumstances of this case, as outlined, so conclude and hold that the verdict in that respect was excessive by $8,000.00. At the conclusion of this opinion, we shall deliver our directions in that regard. We are certain that an award of $2,000.00 will adequately punish the defendant officers and act as a deterrent to others, the designed purpose of punitive damages.

We shall now consider the liability of the defendant Town of Jackson. Section 1–1018.1, W.S.1957, 1975 Cum.Supp., provides as follows:

"The defense of governmental immunity shall be waived to the extent of the limits of liability insurance carried by the governmental entity. This section shall apply to any governmental body or agency in the state securing liability insurance coverage."

That 1975 action of the legislature followed the decision of this court in *Collins v. Memorial Hospital of Sheridan County,* Wyo. 1974, 521 P.2d 1339, holding that as a matter of law, governmental immunity is waived to the extent of insurance coverage.

It is without question from the record and briefs that the town had insurance protecting its police officers but only to the extent of $5,000.00. Letters in the file indicate that the insurance company stands ready to pay that amount. The waiver of immunity is only to the extent of $5,000.00 on that particular policy. Any further question in that regard is therefore moot. The State of Wyoming, through its legislature, has never waived the immunity of municipalities except to the extent of insurance coverage nor has this court ever judicially declared that the State and its political subdivisions and municipal corporations have no immunity. For the latest declarations of the court in that regard, see *Jivelekas v. City of Worland,* Wyo.1976, 546 P.2d 419, and *Awe v. University of Wyoming,* Wyo.1975, 534 P.2d 97.

What becomes troublesome is the problem arising under § 9–712.10, W.S.1957, 1975 Cum.Supp. (§ 1, Ch. 197):

"(a) The state of Wyoming through the department of administration and fiscal control shall purchase a *comprehensive professional liability policy* providing coverage *for all peace officers* charged with the enforcement of state statutes or ordinances.

"(b) The limits of the policy shall be no less than the present limits of liability insurance purchased by the state *for state law enforcement officers* which is two hundred fifty thousand dollars ($250,000.00) per person or five hundred thousand dollars ($500,000.00) per incident.

"(c) For the purposes of this act [§§ 9–276.18:69 and 9–712.10], 'peace officer' means any person who is serving on a full-time, fully compensated basis as a duly authorized member of a sheriff's office, municipal police force, college or university campus police force, the Wyoming highway patrol, game wardens or commissioned employees of the Wyoming game and fish commission, penitentiary guards, special agents and security personnel of the state of Wyoming or political subdivisions thereof, charged with the enforcement of criminal statutes or ordinances." (Emphasis added.)

By § 2, Ch. 197, Session Laws of Wyoming, 1975, the legislature directed the State purchasing and property control division to:

"(n) Secure *personal liability* and surety bonds *for* Wyoming *peace officers*, employees and state officials as required by statute." (Emphasis added.)

By § 3 (misprinted "2") of the same act, money was appropriated to pay the premium for such insurance:

"There is hereby appropriated from any funds in the state treasury not otherwise appropriated the sum of sixty-two thousand dollars ($62,000.00), or as much as necessary *for professional liability insurance for Wyoming peace officers* for the biennium ending June 30, 1977, to be purchased by the purchasing and property control division of the department of administration and fiscal control." (Emphasis added.)

We say only as an observation that those sections *seem* to indicate that the insurance was to be bought not for the state or municipality but for the individual police officers, *perhaps* as a fringe benefit to encourage the acquisition of persons willing to become law enforcement officers. We are unable, however, to make any determination in that regard for the reason that the record is deficient in the absence of the insurance policies and other necessary parties.

 There are many questions which the parties either do not recognize or have neglected to present to either the district court or this court. We are not going to assume the burden of answering those important questions. Amongst others, these come to mind: Has the legislature waived municipal immunity in particular to the extent of liability insurance authorized for purchase from State funds "for all peace officers," "for state law enforcement officers," "for professional liability insurance?" Can we dispose of that question in the absence of the State as a party? Can we dispose of that question in the absence of

the insurance company, which, according to the record, denies liability for punitive damages as to all defendants under its policy? [8] What is a "comprehensive" professional liability policy? What is meant by the words "personal liability" in § 2, Ch. 197, Session Laws of Wyoming, 1975? Why would that expression not include punitive damages?

We are going to dispose of the issue of municipal liability on the record as we find it. During the course of pretrial discovery, the plaintiff, in accordance with Rule 33, W.R.C.P., directed the following interrogatories to the defendants:

"1. State whether or not on July 25, 1975, you had an insurance policy or policies under which an insurance business may be liable to satisfy part or all of any judgment which might be entered as result of the Complaint filed in this matter, or to indemnify or reimburse you for payment made to satisfy that judgment.

"2. If the answer to the interrogatory next above is yes, state:

"a. The name and address of each company issuing such policy or policies.

"b. The policy number of each policy or policies.

"c. The limits of liability of such policy or policies.

"d. The named insured under each such policy or policies."

The replies were as follows:

"Answer No. 1. Yes

"Answer No. 2a. American Home Insurance Company, New York, New York.

"Answer No. 2b. PPL350 28 41

"Answer No. 2c. $500,000 per person, $1,000,000 per incident.

"Answer No. 2d. State of Wyoming, its political subdivision [sic] and full-time law enforcement personnel or employees thereof. The policy has a lengthy endorsement indicating the coverage, a copy of which will be supplied upon request."

 From those answers, since no exception is noted, we conclude and hold

---

8. This court had an advantage in *Collins v. Memorial Hospital of Sheridan County*, supra, in that it had the insurance company before it as a party and so could make a complete and satisfactory final disposition as to all parties in interest.

that the town has admitted insurance coverage for the whole judgment. If, in fact, there is a question about complete coverage, the defendants will possibly have to litigate that issue with the insurance company. We cannot resolve the problem in this case. Both the district court and this court should be able to rely on answers to interrogatories.

We affirm the judgment of the district court for compensatory damages but hold punitive damages to be excessive. We direct that if the plaintiff elects to take a judgment of $2,000.00 for punitive damages by filing a remittitur of $8,000.00 in the office of the clerk of the district court within 15 days after filing the mandate of this court in that office, then the judgment as against the defendants, as so reduced, shall stand affirmed. Otherwise, that portion of the judgment, constituting punitive damages, shall be reversed and the cause remanded for a new trial on the sole issue of punitive damages.

THOMAS, Justice, concurring.

I concur in the result reached by the majority opinion insofar as it treats liability, compensatory damages, and punitive damages with respect to the individual police officers. I would not, however, consider the claims by the Town of Jackson made in its brief that it should be excused from exemplary damages under either the general law or the doctrine of sovereign immunity. I cannot find in the record where these claims were properly made to the district court and therefore preserved for consideration on appeal.

It is my conclusion that by implied amendment or otherwise the record discloses that the plaintiff was permitted to rely upon waiver of the doctrine of sovereign immunity. A supplement to the record made in this court suggests no insurance coverage for the exemplary damages. It does not appear that the Town of Jackson ever presented the claim that because there was no insurance coverage there was no waiver of sovereign immunity so far as the exemplary damages are concerned to the

district court, and from the answers to interrogatories quoted in the majority opinion the inference would be to the contrary. In its motion for a judgment notwithstanding the verdict, the Town of Jackson injected as a ground the general rule that a municipality is not liable for exemplary damages. That could not be considered by the district court, however, because the same ground was not presented in a motion for a directed verdict. *Sulmeyer v. Coca Cola Company*, 515 F.2d 835 (5th Cir. 1975), cert. denied 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 341 (1976); *Hedden v. Hall*, 23 N.C.App. 453, 209 S.E.2d 358 (1974), cert. denied 286 N.C. 334, 211 S.E.2d 212 (1974).

I find it regrettable that the nonliability of the Town of Jackson for exemplary damages was not preserved for consideration on appeal. If this issue were properly before this court, I would be disposed to hold that a municipal corporation, such as the Town of Jackson, is not liable for exemplary damages under the general rule as set forth in *Desforge v. West St. Paul*, 231 Minn. 205, 42 N.W.2d 633, 19 A.L.R.2d 898 (1950). See also the cases cited in support of that proposition in Annot., 19 A.L.R.2d 903 (1951).

ROSE, Justice, partially concurring, and partially dissenting.

I concur in the result, while withholding my agreement from two portions of the majority opinion. First, I cannot agree that the award of punitive damages is so excessive as to appear to have been given under the influence of passion or prejudice, and that this court should second-guess the jury and reduce them. Secondly, I am not in accord with the majority's treatment of the insurance issue.

## PUNITIVE DAMAGES

The majority says:

"However, when it comes to the consideration of punitive damages, it would shock our collective conscience to approve them in the amount awarded. . . ."

It does not shock *my* conscience for a police officer to have to pay a penalty of

$10,000 instead of $2,000 for hasseling a citizen in public and arresting him without probable cause. We said in *Petsch v. Florom*, Wyo., 538 P.2d 1011, 1014, that we would hesitate to interfere with an award of punitive damages "except in extreme cases." Where, in *Petsch*, it was argued that the punitive-damage verdict was excessive and prompted by passion and prejudice, we said, at 538 P.2d 1013–1014:

". . . As said in *Booth v. Hackney*, Wyo.1973, 516 P.2d 180, 181:

"'* * * It is settled law in this state that, before a verdict of a jury will be set aside as excessive, it must appear to be so excessive as to denote passion, prejudice, bias, or some erroneous basis. *Holly Sugar Corporation v. Perez*, Wyo., 508 P.2d 595, 601; *Hack v. Pickrell*, Wyo., 515 P.2d 134 (handed down 10/25/73); *State Highway Commission v. Peters*, Wyo., 416 P.2d 390, 391; *Pan American Corporation v. Like*, Wyo., 381 P.2d 70, 76.'

No reasons are advanced why the verdict is excessive. It was for the jury to decide. There is no expert who can tell us what punitive damages should be any more than one can tell us what pain and suffering is worth. The amounts here, in themselves, strike no sensitive nerve, as unconscionable."

As I view the matter, when we undertake to announce that a $10,000.00 punitive-damage verdict is unconscionable but $2,000.00 is not, in an appeal where the jury also found actual damages to be in the sum of $5,000.00, we are doing nothing more than substituting our personal and collective opinions and prejudices of what is a proper damage figure for the jury's damage-determining task. This is not our function.

Before we overturn a jury verdict, we must have a good reason. I find no such reason here. This is not a case like *Hall Oil Company v. Barquin*, 33 Wyo. 92, 237 P. 255, where the award of punitive damages was three times the value of the real property in question and twenty times the amount of actual damages awarded by the jury. In addition, we are not here faced, as we were in *Hall Oil Company v. Barquin*, with the possibility that the jury premised its award solely on the respective wealth of the various defendants. Even in *Hall Oil Company*, we only directed a remittitur from twenty-to-one to an eight-to-one difference between actual damages and punitive damages. In this case the jury gave punitive damages which were only twice the amount of actual damages given, yet we are arbitrarily reducing that to less than one-half the actual-damage figure.

The punitive-damage award in this case is not disproportionate to the award of actual damages, nor is it unrelated to damages claimed or the cause thereof. We have no basis upon which to conclude the jury to have been inspired by passion or prejudice. We have heretofore steadfastly adhered to the principle that the amount of punitive damages is largely in the discretion of the fact-finder. *Wilson v. Hall*, 34 Wyo. 465, 244 P. 1012; and *Petsch v. Florom*, supra. We do so for a fundamentally sound reason. As stated in *Petsch v. Florom*, supra, at 538 P.2d 1014:

". . . Since the fact-finding function is passed on to the jury and it is left up to that body representing the sense of the community and its view of such matters, the quantity is for the most part then within its discretion."

Certainly, such discretion is not unlimited and, in appropriate cases, the remittitur procedure embraced by the majority opinion can be utilized. *Hall Oil Company*, supra. I do not believe this is such a case, especially when the trial court itself did not see fit to grant a remittitur.

I am, therefore, greatly troubled by the majority's cavalier reduction of the award from $10,000.00 to $2,000.00. I cannot subscribe to the belief underlying the majority opinion that this court is in a better position than a jury or trial judge to determine what amount of punitive damages will have a deterrent effect—or will adequately punish the defendant-officers for their unwarranted arrest. The jury—representing the sense of the community—has already exercised that function in a reasonable fashion. We should not interfere.

**1260**

THE INSURANCE ISSUE

I concur in Justice Thomas' treatment of the insurance issue. The plaintiff was, in the trial of the issues of this case, permitted to rely upon a waiver of sovereign immunity of the town. We, therefore, should not have considered the issue in the majority opinion. It is only obiter dicta and of no force and effect, either here or as precedent.

Further, my position on the question of sovereign immunity is well known. See *Jivelekas v. City of Worland*, Wyo., 546 P.2d 419, 423-433; and had it been necessary to treat with the question of immunity, my position here would be the same as my dissent in *Jivelekas.* I would have held that the town must answer for its wrongdoing in the same manner as do private citizens and that it enjoys no immunity therefrom.